v. Executive Director, Florida Commission on Ethics, Appellants & Cross v. Executive Director, Cross v. Executive Director, Florida Commission on Ethics, Appellants & Cross v. Executive Director, Florida Commission on Ethics, Appellants & Cross v. Executive Director, Florida Commission We had a Speaker of the House who went to prison for a couple of years. What happened was a constituent would come to him and say, I need some help with this problem I'm having. The Speaker said, what you need is a lobbyist. You're in luck today because I'm a lobbyist. For a retainer fee of this amount per month, I can help you out. Then the Speaker goes across the street to see the Governor. Lo and behold, he gets help because he's the Speaker of the House. As far as the Governor knows, that's all he is. He's the Speaker of the House. He has no idea that he's also on the side of a lobbyist. He's making money on the side for being Speaker of the House. When I look at this case and I look at what the people of Florida have done, and what they've done is they've said, if you hold an elected position, you don't stop being the Mayor, the County Commissioner, the Legislator. When you want to go speak to other government officials about government, you can't be doing it as a lobbyist making money on the side. As far as we're concerned, you're on the clock. That's where that concern comes from. Why don't you come forward and speak to us? Good morning, Mr. Chief Judge, Your Honors, and may it please the Court. I share your concern, Your Honor, I guess to just dive right in. Is it government speech? It seems like basically the people of Florida have said categorically, this is off the table, you can't do this if you're the Mayor or the County Commissioner. I certainly share the problem, and I'd like to try to also address how I think that's reflected in the analysis, but as a matter of the terms of our constitutional restriction and the implementing legislation, there's an express exclusion for carrying out your official duties. Now, I think something interesting about that, though, that . . . You're free to talk to all these government officials about all these matters, as long as you're not being paid for it, right? Correct. Yes. In considering the thinking that the Court offered in the focus order and the extra thoughts that Your Honors provided today, and in reviewing the cases that you cited, and in discussing this with some of my other colleagues who are better versed in government speech doctrine, we think even though this is expressly excluded from Florida's restriction, carrying out your official duties, that is, that the Court has flagged a standing issue, which is whether Plaintiff Garcia, who's the only plaintiff withstanding here, intends to lobby in the course of carrying out his official duties, which is not prohibited by this restriction, it's prohibited by others, or rather in his individual capacity, which is prohibited. So I'll just start with the express exclusion . . . But it's a fiction, isn't it? Isn't that what basically the people are saying is, of course you can do it in your official capacity, but the notion that you're doing this in some individual capacity for money, we're not going to allow you to do that. I think that's a big concern of the people driving this restriction, Your Honor, and to the extent that this does not fall within the express exclusion, I think the very facts that are bothering Your Honor, that bother the people of Florida, go to the government . . . Tell me about the exclusion and why you think it's important here. The exclusion says precisely what? It says in the Florida Constitution, Article II, Section 8, F4, that the restriction, quote, shall not be construed to prohibit a public officer from carrying out the duties of his or her public office. Implementing legislation, Section 112.312112B1 provides that the term lobby for compensation excludes, quote, a public officer carrying out the duties of his or her public office, end quote. So because government speech requires you to be speaking pursuant to your official duties, we don't think that the restriction regulates government speech. But it's a ban, isn't it? It is. Of that speech being under the guise of a private lobbying contract, right? Yes. Well, so that's at least in many . . . Why doesn't that mean that the people of Florida have decided you can't disaggregate these things? I think they have. You're free to do it as a government official in your official capacity. You just can't pretend that you're doing it in an individual capacity. So, Your Honors, we have another ethics restriction. I think the one that most easily comes to mind is misuse of official office. And if you are performing your official duties to your own private benefit, that is separately restricted. That's just not the subject of this restriction. But all that said, I think the ambiguities that Your Honors bothered by play into a standing issue that I had not identified because I was not . . . I want to make sure that we are not confusing the term government speech because it's not true that whenever a government employer official says something in the course of their official duties, it's government speech, is it? I mean, we've said that there are a range of factors that you have to consider to determine whether the person is speaking as a holder of an office or as an employee in the course of their duties versus if it is the government qua government speaking. Isn't that correct? That's correct, Your Honor. It's a highly fact-intensive inquiry. I think the problem . . . And I think that's really the only principle we need to consider here. But what we have here is a government official talking to other government officials about government, right? Correct, Your Honor. And so, all we know . . . It does not strike me as a standing issue. As I understand it, you've got a plaintiff who wants to be able to effectively violate this restriction, who contends the restriction is an infringement of his First Amendment rights, but for the restriction, he would do lobbying on these subject matters, right? I think that's right, Your Honor, and I think I share all the concerns that you have . . . He has standing to complain about it. I'm sorry? He has standing to complain about it. Well, so if he is carrying out . . . If he is, in fact, carrying out his official duties, that is expressly excluded from the scope of this particular restriction that's challenged here. It is prohibited elsewhere, but he challenges this restriction specifically, and he has to show that it actually prohibits what he wants to do. If we can just pass the standing part for a moment. I want to know directly what your position is. I know you didn't raise this below. We didn't. I know you haven't raised it in any brief that's been before us at all, but put all that away. Do you believe this to be government speech or not, what Commissioner Garcia wants to do? Your Honor, I'm not trying to evade the question. As I understand standing, we do not have enough facts to . . . Put standing aside. I'm asking you . . . There's standing, okay? Assume it. Now answer his question. Do you believe this to be what he wants to do to be government speech? I do not believe that it is government speech based on what he has said. Why? Because he says that he has . . . He is a Miami-Dade County Commissioner. He has a private business. He wants to represent nonprofits in seeking appropriations before the floor . . . Because when he wants to go do what he wants to do, he's not wearing the commissioner hat. He's not doing it pursuant to his office. He's doing it, Rene Garcia Incorporated, in a separate office, in a separate building, speaking about matters that are pertaining to what's in front of the commission at the time, with no authority from the commission itself, right? That is my strong assumption from what he has said. And part of the reason for that is that he and many others to whom this all applies is a part-time employee of the government, right? A part-time. These are not full-time jobs. This is not the governor. This is not, you know, a judge on a court full-time. These are explicitly, for the most part, part-time jobs, correct? I understand many of them to be, but . . . Do you like the Speaker of the House? He's like a legislator, part-time job. Do you know how much he makes? I do not know how much he makes. I think it's only like $3,000 or $4,000 or $5,000 a year, as I understand what Miami-Dade County Commissioners make, right? I do not know, and that's part of the record, but that would not surprise me. Okay. Well, let's assume it's private speech, okay? How is it constitutional? So I think if we're proceeding to our balancing test, we think the proper test to apply here is Pickering NTEU balancing and that this restriction clearly survives balancing. What case have you found in any circuit or the Supreme Court or ours that has applied NTEU, the Pickering, as modified by NTEU, to an elected official? We do not have a case that says that here. How do I reconcile that? Like, how do I get there? I want to get there, but how do I get there? So the whole reason that the balancing test started in the first place was a recognition that the government has an interest that is special and separate from any interest that it would have in regulating the general public, right? So that is related to the provision of public services. And NTEU phrased that for the first time in a generally applicable test. It said, as the government regulating its employees, pursuant to the special interest. But I think what has been maybe lost sight of in applying what is usually a very helpful rule of thumb is that, of course, elected officials are helping to provide public services, and they have the ability to adversely affect the operation of government. But in every other Pickering NTEU that I've seen, they are the employer, not the employee. They are the ones that set the policy, not the ones subject to the policy. And I guess I'm just having – I'm having trouble understanding how it all fits together. Sure. Your Honor. What's the best case you have? So I don't have a case, but reasoning from first principles, I think the government is the employer. The people are the employer. And here, setting aside the facts of any other case, they have regulated, by a direct democracy and passing this constitutional restriction on their public officials that they elected to do a job. There is no doubt that they provide public services. And then the question becomes, given that they do, could they possibly adversely affect the operation of government? And the answer is, of course they could. And so just because we're applying – balancing that – go back to the hypothetical I gave you about the Speaker of the House. The Speaker of the House comes in and he doesn't say anything about any legislation pending before the legislature. But the governor has business with the Speaker of the House all the time. Helping the Speaker of the House with this constituent problem, it might be a problem in a particular department or something like that, could redound to the benefit of the governor in dealing with the Speaker of the House on other matters that are in the legislature. You don't really – the idea that this is on your own time, for your own benefit, your own little private business, when the county commissioner or the mayor comes to see you, I just don't know how the governor knows, oh, they're not here as a county commissioner or the mayor. I think that's right, Your Honor, and I think that means the government interest is very strong in many – So you want to run away from the idea that it's government speech? I don't want to run away from it, Your Honor. I just think that's the doctrinally correct answer to your question. But if you disagree on that, we can explain what that means. Well, there's not a case that really tells us the answer in the context of an elected official. Isn't that right? I mean, all these cases that we've dealt with in the past, these are lower-level government employees. Correct. Aren't they? They are. Yeah. Do you know of any case that reaches the opposite conclusion or at least doesn't apply NTEU to a lobbying restriction for an elected official? That does not apply – I'm sorry, Your Honor, I think I'm having a little hard time. Sure. So I asked you whether there was an NTEU-like case for public officials. Do you know of any that did not apply NTEU but instead applied the traditional either strict scrutiny or intermediate scrutiny to a lobbying restriction for an elected official? I think Kerrigan is a time, place, and manner restriction case on a restriction that applied to legislature speech. And that was not content-based, though, right? It was held to be content-neutral. I mean, we analogize to it. This isn't about when you get a parade permit on the street. Isn't this really about kind of an ethics problem, the idea that you're trading on the influence that you have by virtue of being an elected official? That's absolutely the problem, Your Honor. And just briefly, Judge Luck, I'm sorry, we do have the Seifert case from the Seventh Circuit that applied modified Pickering balancing to elected judges. That's the judicial one. I just think with Williams-Yulee, the judges are sort of treated a little differently. Although I was going to ask about the Yulee case, it seems to me that although judges are certainly different in a lot of respects, my own skepticism about maybe whether the court was right in that instance were certainly obligated to follow it. Why doesn't the Yulee case say for certain elected officials the government has an extremely strong interest in ensuring that they don't do things that would cause the citizens to doubt the kind of purity and ethical nature of their decision-making and that that's a strong enough interest to survive strict scrutiny? Again, I'm not sure, being maybe more candid than I should, that I would have found that that satisfies strict scrutiny, but why isn't that a good case to support your argument here? Your Honor, may I? Yes. I believe it is. I think recognizing the reality of the fatal in fact of strict scrutiny, we do cite to and use that case at various points in our brief, but because it's a strict scrutiny case and we don't think that's a proper test, we didn't really squarely focus on it. But I do think it sets out the government interest in a way that I think is helpful here and should be instructive at least in an analogous sense. We've had some cases I think in the past where we've discussed that the kind of balance on the government's ability to regulate speech differently for its own officers or officials or employees might look different depending on the role of that person. I'll ask your friends on the other side this too, but do you think that there's room, if we looked at the Pickering balance, to adjust on both sides of the balance in the sense that if the officials on this side are elected officials rather than employees, straight employees, then maybe the interests on the other side look different that would be sufficient or appropriate. Is that too much of an extension or reworking of Pickering or do you think that's essentially what Pickering is directing us to do? I think that's exactly what we're directed to do. I mean, we say as much in our brief that we think all that you're doing when you're applying balancing is recognizing this government interest in the provision of its public service. And then we say as much in our brief that we think a legislator speaking on the floor of the House has a very strong, can claim a much stronger interest perhaps if you consider that to be public speech or private speech than, say, someone else. And similarly, the government probably has a correspondingly lower interest. All of that can be accounted for in balancing. So I think your Honor's right, and I don't think that constitutes an extension of balancing in any meaningful way. Okay, Ms. Preston, you've saved some time for rebuttal. Mr. Hyson. Good morning. May it please the Court. The questions you raised with opposing counsel I think speak to the issue of tailoring, really, I think, when you think about it. That in an understanding that not every... Not my questions. Well, I think they do, and I'll explain why. There needs to be a recognition, I think, that not every public official in the state of Florida has the same authority or has the same apparent authority in the eyes of the public or in reality. So the Speaker of the House of the state of Alabama is someone who has a fairly extraordinary amount of power and a regime of ethics laws and lobbying restrictions laws that would treat the Speaker of the House differently than a municipal part-time elected official. That's who our plans are here, two people who are part-time elected officials. I don't know, if I live within their jurisdiction, I might think that the county commissioner or the mayor has a lot more day-to-day power that affects me, whether I get garbage collection or get a road paved or something like that, than even the Speaker of the House. Absolutely, I understand that, Your Honor. The issue with this law is that it treats lobbying in every jurisdiction in the state of Florida the same. And the particular lobbying that's at issue here and the particular lobbying that in our view makes this an overbroad and facially unconstitutional law is that lobbying before a municipality 600 miles away is considered equal and just as likely to create the appearance of quid pro quo corruption. He can lobby them, he can go talk to them, he just can't be paid on the side if he wants to be an elected official. If this elected official wants to go talk to other government entities about fundamental governmental matters, he can't hire himself out. This is the price of being a county commissioner or a mayor. The potential for corruption is just too great. Disaggregating when it's your official office and when it's not is too difficult and you just can't do that. You can go talk to them all you want, you just can't be hiring yourself out while you hold that title. A couple of things. First of all, it's a constitutional matter. Paid speech versus unpaid speech is of equal First Amendment footing. The mere fact that we're talking about paid lobbying as opposed to unpaid lobbying really does not, as a constitutional matter, make a difference. That sounds really interesting to me. I have outside limits on my income. I can go teach, Congress says. I could go write a book. There's a cap on how much money I can make if I go teach. I can't go practice law, can I? I think that's the distinction between full-time government employment versus part-time unemployment. I think that gets us into a pickering analysis. Even if I won the D.C. Circuit and I had their caseload, it would still apply. Understood, Your Honor. What we have here is a law that, again, recognizing it, as far as the standing question, the standing was uncontested below, was uncontested on appeal. It's also uncontested that what we're talking about here are people who are part-time elected officials. The state recognizes this. They're expected to. It's literally intended that they have private employment. If you're a county commissioner or mayor and you go out around town and you walk into a restaurant, everyone says, hey, there's the mayor, right? Understood. And if a constituent comes up and says, hey, I got a problem, mayor.  And if the regulation here said that a local elected official is prohibited from lobbying before any municipality in their county, say, where everyone knows them, and whenever they go to town, they go to the diner. They call him Mr. Mayor. That would be a different constitutional analysis. That would be a different law. But the record, for instance, in this case... Counsel, I understand that the analysis would be different based on the scope of the law, but I guess what I want to sort of hone in on is the test that we actually have to apply. I know you've sort of intimated with tailoring, and I know, obviously, from your argument, you want us to apply some sort of strict scrutiny. Why does the NTEU balancing test not apply here? Well, one, you raise the point that it's just not applicable to elected officials. Because we haven't applied it to that, I'm not sure that it's not applicable. I think Judge Grant's point, and I'm interested in your discussion of that and your point of your opposing counsel, which is the test seems to... There's a sliding scale for where you are on the map of employment. In other words, the janitor and regulations as to him or her have very different balancing than regulations on the city manager, for example, who's hired by the council. Why does it just not affect the balance because someone's an elected official? Well, a couple of reasons when you kind of take a step back to what the animating purpose of Pickering is. And, in fact, this court discussed this in the Warren. The Warren decision understood that was vacated on mootness grounds. But the court went through this analysis and spoke very clearly that the rationale behind Pickering doesn't apply to elected officials. And part of the reason for that is that the government interest that in Pickering and NTEU rises to a level to be competing with the First Amendment interests is the government's interest in providing efficient government services. And through that, actually having, exercising some control over its own employees. In fact, there's a case that this court had in the fall that talked about... I know, but Warren had to deal with his own policies. And there I understand why we wouldn't call that sort of the regular sort of Pickering balance. But here you have really the sovereign, the people, imposing burdens on everyone up on down from the executive directors of agencies up to the elected officials. So why is that not similar to a restriction that the boss of the county manager putting on for every employee in the county? I just don't see it as that different, just who's imposing it. Well, again, I think it's the level of a control over the employee. And in fact, the Supreme Court itself has said that Pickering really needs to be limited to a traditional employer-employee relationship. And whatever relationship between the... What's more traditional in a system of popular sovereignty than the people restricting their officials? Well, but the way that the people restrict their officials is... It's through their constitutions. But also through the ballot box. I mean, the way you... The mayor of South Miami... In this case, it's both. They did both. They went to the ballot box to amend their constitution. Well, part of control is the ability to actually remove. And that's just... The state constitution really doesn't have any power to remove this whole... Do you think the people have any way to know at the time if their school board member is using his or her kind of aura of the school board in order to get favors for their private lobbying contacts? I mean, I think this is a prophylactic rule based on the people's concerns about corruption in the government. Why isn't that a valid concern of the people of Florida? It certainly is a valid concern. The way it's applied, though, is... Needs to meet strict scrutiny because the only compelling state interest that justifies a restriction like that is corruption of the fear of corruption, or appearance of corruption, rather, as distinguished from the appearance of access or influence. And the courts have made clear that. And that's the danger of... My apologies. No, it's all right. But that assumes strict scrutiny applies. I probably tend to agree with you if we were to apply strict scrutiny. But I think the issue is, why doesn't the NTEU apply? So you mentioned one distinguishing factor. I think we've run that down. Is there any other reason why not to apply the NTEU balancing or some version of it? Well, there's some authority that says that elected officials really should... That their First Amendment rights are broader for the purposes of being elected. And so having a pickering where elected officials are having their own speech cabin, I think it might be in conflict with bond. I agree, though, in a certain extent. And that's why I ask about the balance on the two sides being different. I think for elected officials, you certainly couldn't tell them, say, you can't be involved in a political campaign or political speech, right? That's obvious. But the different interests on the side of elected officials demand a different rule with respect to political speech. But why can't they also demand a different rule with respect to these kind of influence peddling concerns? Our position is not that these can never be regulated and the state's interests in regulating them aren't legitimate. As the state said, we already have existing conflict of interest laws. To your question earlier, which I didn't get an opportunity to answer to, I mean, lobbying is... There's disclosure rules already. So if your local school board member were to register as a lobbyist, that would be a matter of public record. One thing I just want to make sure that, because this is in the record and it's kind of an example that shows why this is overly broad, is that, for instance, Mayor Fernandez, the mayor of South Miami, city of 12,000 people, one of his clients has interest in Volusia County, Florida. That's 250 miles away. The idea that there's some special influence that Mayor Fernandez has because he's the part-time mayor of South Miami in Volusia County, which is in central Florida. I know not everyone here is from Florida, but there at least has to be evidence to support that. And I think that's the big hole in the state's case is that even under Pickering, even under NTEU, there has to be an evidence-based determination that the harm that the state is trying to cure actually exists. And there's nothing in the record. And the state is, by appealing to logic and common sense in their reply brief, has essentially admitted that there's nothing in the record of any evidence, no incident, of a local elected official. And that's really the over-breadth argument we have here, is that when applied at the local level, every town, every tax... Pickering doesn't require that kind of narrow fit. And there is a lot of evidence in the record of quid pro quo corruption and quid pro quo corruption between elected officials and others. Is there not? I mean, you're probably, again, on a strict scrutiny, you're probably right in terms of the tailoring, but the Pickering-NTEU balance doesn't require that level of fit. And there does seem to be a lot in the record, let's put it this way, there seems to be a lot of smoke in the record about corruption in Florida. Well, that's corruption in Florida. That's not corruption arising from local elected officials in their day jobs. Give me a break. I mean, county commissioners are an endless source of corruption, in my experience. I used to be a state attorney general. I prosecuted four out of five county commissioners in one county and removed them all. I mean, give me a break. But I understand, Your Honor. I mean, I'm from Miami, so I'm familiar with political corruption. But there still needs to be... I live in Jefferson County, the most populous county in Alabama. It's where Birmingham is. And we had just scores of county commissioners go to prison. But, again, I mean, there's existing conflict of interest laws that are the reason they went to prison. There's existing conflict of interest laws, and the reason why... No, they went to prison because of the Hobbes Act. Well, understood. I understand, but this is a narrow... To get back, would you say that if there were appropriate geographical restrictions, that this law would satisfy strict scrutiny? If it was more narrowly tailored to actually address the purported harms that... Again, I just don't think the record bears any evidence that shows that... Well, if you're saying purported harms, then you're saying, no, we don't have evidence of the harms either, so it doesn't satisfy on either side. I'm trying to narrow down and see if there's a recognition of the harm in the state's compelling interest, but you say there's a problem on the narrow, tailored end. Correct. Again, I think it goes back to what I said at the very beginning. I think if you look at other states, they have laws... I've heard this described, I can't remember if it was in the record or not, of top-down lobbying laws, so to Judge Pryor's point. The more authority the elected official has, the greater constraints on their ability to have any private business at all. No one expects the governor to be freelancing as a lobbyist or something like that, or representing legal... But at the same time, he could say that this is his free speech. As an elected official, Pickering or NTU doesn't apply to him, so why should the people be able to give that restriction? I think your argument goes really as far as the governor by its own terms. And there's no governor that's ever been removed for corruption, so there's no evidence of that. But I guess my point is that I can see a regime where members of the state legislature, for instance, because of the authority the state legislature has, and the authority the state legislature has as far as controlling the purse strings for local governments. Yeah, but he's just in Tallahassee. He doesn't control anything down at Miami. Well, no, that's to my point. I can see a regime where the legislature is subject to anti-lobbying measures. The fact that they all vote on statewide legislation and that they all log roll. Absolutely, I'm not disagreeing, Your Honor. What I'm saying is what we have here is the inverse. We have bottom-up is what this legislation does. And it assumes that down to the local taxing commission that there is implicit in every single elected official in the state of Florida, which in the record is uncontested, that most of them are local, most of them are privately employed with their own jobs. Isn't it just interesting that the job that they choose to do when they're not being an elected official is of all things lobby? Well, for instance, Mayor Fernandez, one of the plaintiffs here, he's an attorney. He's an attorney, and in part of his... This doesn't prohibit the practice of law. Well, it does prohibit practice of law if it requires lobbying before governments on certain issues. Okay, you wouldn't prohibit him from coming in and doing what you're doing, did you? Absolutely not. I don't know if I've overstepped my time. Your opponent went over. You're on our time. Understood. Well, in Mayor Fernandez's case, he has clients who sometimes seek procurement contracts for goods and services in other communities, not his own community, obviously, not in Dade County. And in that instance, as I mentioned, Volusia County, 250 miles away. In that instance, I think at very minimum, there should be some evidence that there is this presumption that the law has created, this presumption of quid pro quo corruption, which is a pretty high standard. What if the three of us wanted to start a yoga studio? I'm trying to pick something really likely. And I don't think there's any evidence that federal judges have caused corruption by starting yoga studios. It's totally separate from our duties. There's no evidence that that has been a problem. Why can the Code of Judicial Conduct say, sorry, guys, you're going to have to stick to being judges? A couple of things. I think, as Judge Luck pointed out, judges are treated a little bit differently under the law. And plus, that's not political speech. I think part of the analysis here is we're talking about... Expressive. We're talking about... Expressive W. I'm told. But this is core political speech. It's entitled to the highest level of First Amendment protection. This is petitioning the government. And given the First Amendment protections for that speech, the law, including Pickering and NTAU, require at least some evidence that that particular conduct creates an actual harm to the government. And just my last point, my apologies, is that in forward-looking speech regulations such as this... This is not a disciplinary... Someone after the fact, like in Pickering. In forward-looking speech regulations, the NTAU said this and Janice said this as well, that the burden of evidence that the state has to demonstrate to satisfy that test is higher, and the deference allowed to the stated harm of the state, the predicted harm, is reduced. And that's... So it is our position that even under NTAU tests, especially... Let me ask you one more thing before you sit down, OK? My apologies, Your Honor. I said let me ask you one more thing before you sit down. And I think this really does go to standing as opposed to the other things that have been labeled standing that had nothing to do with standing this morning. None of your clients is a former elected official challenging the application of this law to former elected officials, right? Correct, Your Honor. That's not at issue here. OK. Thank you. Thank you. Ms. Preston. Your Honors, I'll be quick. I just have two points I'd like to make. First as to which test applies, I think this court has to be prepared to effectively recognize a hierarchy of private First Amendment speech rights if it exempts elected officials from pickering balancing. I think the alternative is, as Judge Graham pointed out, we can just account for any special circumstances that warrant the adjustment of either side of the scale of the balance in the application of balancing to elected officials. Secondly, a vote is not always, maybe hardly ever indicative of the constitutionality of a restriction. But in this case, nearly 80% of Floridians approved this constitutional amendment. It was implemented by a unanimous legislature. And the harm that we allege here is felt by those people. I think that that certainly counsels in favor of finding an incredibly strong government interest here, whether it's considered logic or evidence. What do you make of your friend on the other side's contention that some law of this sort could be appropriate and even constitutional, but if you're stopping a county commissioner in the panhandle from lobbying in Miami, that's really more than you need to be doing given the recognized First Amendment protected nature of this speech. I think that the significance of that depends on which test the court's applying. And as the U.S. Supreme Court put it in Mitchell, if you're applying balancing, I think that becomes a difference in detail that is not, on which the judicial review does not turn. Like that matter is for the legislature and the people to decide those differences of detail and our restrictions should survive, especially under balance. At some point though, the interests of speaking are so important. And I think you'd have to agree, even under NTU, public officials' ability to speak on political matters is significant, even in the context of private in-office lobbying. On the other hand, a very broad law that seems to cover all sorts of things that really can never be quid pro quo corruption, at some point that would affect the balance, would it not? So I think, Your Honor, first of all, I think if I understood your question right, that misunderstands the most basic interest that we argue is at play here, which is the appearance of quid pro quo corruption, not actual quid pro quo corruption. I understand. Thank you for correcting me. So with that acknowledgment, answer my question regarding how would that, wouldn't that, at some point it would affect the balance, the over breadth and the fit, would it not? I think it could. It's hard to speculate because we don't have all of those potential applications laid out. We have one here, assuming for justice. We have one here and what we know about Mr. Garcia is that he is a past house member and Senate member who wants to go lobby the legislature on behalf of private clients for appropriation matters and he also serves as a county commissioner. I think those are extremely strong facts that suggest it is not one of the instances that Your Honor's concerned about. Would it make a difference against you if there were any kind of allegation that there's some kind of pretextual intent to stop a certain kind of speech or even to stop a particular person? I think it might, Your Honor. We didn't get to talk about the other state's restrictions. I was going to talk about that a little bit if we did, but I guess just most succinctly I will say that the history and tradition of lobbying restrictions restricting public officials who are serving in office suggests that that sort of pretext is not there and those restrictions include restrictions that draw distinctions like ours here. If you think they're content, we obviously argue they're not content-based, but even if you think that they are, they seem to be fully justified and recognized and widely used among states. I hate to keep taking this over, but that did remind me I had one question. At first I found your not content-based argument appealing, but I thought the other side's point about the fact that lobbying for appointments or things like that wasn't categorized. Doesn't that make it at least a little bit content-based? Not insofar as I understand the point of that test, Your Honor, but it's hard for me to instruct you on how to identify content-based restrictions. It's obviously not viewpoint-based, which is an even greater concern, at least in words and not in practice, but it seems to me that once you're saying, well, you can ask elected officials for this, but not for that, then maybe it is content-based. On my reading of our law and its purpose, I think that that is an accidental, if it's an exclusion at all, and we argued in our brief that actually all of these things fall under the capacious definitions, but to the extent that there's an accidental omission, that that was inadvertent. I'm not lobbying for an appointment. I mean, that's not covered by any of the exceptions, is it? If I hire Commissioner Garcia to go lobby for me in the legislature to be appointed on the Commission of Ethics, for example, which is within the power of the Speaker and the Senate President, how is that covered by this? And if it's not, then don't you have to look at the content to decide that? Your Honor, we did. I believe they listed that out as one of, and we addressed this in our brief, and forgive me, I'm forgetting, which I believe it would have been defined as an issue of policy, or it would have been an issue of policy as defined in the statute under our reading of that definition, but I think the cleanest way to think about this is that even if you think it's content-based, it's fully justified in the same way that I think the hatchet... Let me make sure I understand what you just said. You view that as policy and therefore prohibit it. Correct, Your Honor, yes. So that's one way to look at it, but even if you think we weren't right about on that reading, we think it's fully justified. Okay. Thank you. Thank you. We'll be in recess until tomorrow.